IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 12–cv–01886–RM–KMT

SUSAN K. CARSKADON,

      Plaintiff,

v.

DIVA INTERNATIONAL, INC.,
FRANCINE CHAMBERS, in all capacities, and
CARINNE CHAMBERS, in all capacities,

      Defendants.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

**Magistrate Judge Kathleen M. Tafoya**

      This case comes before the court on Defendants' "Motion to Dismiss Third Amended Complaint Pursuant to Rule 12(b)(2) and (6)." (Doc. No. 58, filed May 15, 2013 [Mot.].) For the following reasons, the court recommends that Defendants' Motion be GRANTED in part and DENIED in part.

### FACTUAL BACKGROUND

      The following factual background is taken from Plaintiff's Third Amended Complaint (Doc. No. [TAC]) and the parties' briefing with respect to this Recommendation. Defendant Diva International, Inc. ("Diva") is a corporation based in Kitchener, Ontario, Canada (TAC ¶ 6),

and Defendants Francine and Carinne Chambers, the "owners" and controlling partners" of Diva, are domiciled in Canada (*id*. ¶¶ 2, 4).  Plaintiff is a United States citizen and is a resident of Denver, Colorado.  (*Id.* ¶ 1.)

In May and June, 2005, Defendants engaged Plaintiff to act on behalf of the company and to provide marketing expertise for Diva and its products, which are medical devices regulated by both the United States Food and Drug Administration and Health Canada.  (*Id.* ¶¶ 6, 7.)  At the time Defendants engaged Plaintiff, she had an established reputation in the Natural Products and Natural Feminine Hygiene industries in the areas of public relations, advertising, regulatory compliance, and marketing.  (*Id.* ¶ 7.)  Plaintiff's reputation in this industry induced Defendants to engage Plaintiff in a working relationship.  (*Id.* ¶ 8.)

Plaintiff initially entered into an independent contractor relationship with Diva.  (*Id.* ¶ 9.)  However, Plaintiff maintains that that relationship ultimately transformed into an employment relationship.  (*Id.* ¶ 11.)  Over time, Plaintiff was given more responsibilities, in addition to her previously contracted tasks.  (*Id.* ¶ 10.)  For example, Plaintiff was assigned the role of Marketing and Sales Manager, which gave her responsibility for Diva's domestic and international sales and marketing, as well as responsibility for management of Diva's broker network in North America.  (*Id.* ¶¶ 12, 16.)  Plaintiff disengaged from other relationships and devoted the majority of her time to Diva.  (*Id.* ¶ 14.)

In October 2009, the parties discovered that Defendants were not paying taxes in the United States, nor were they withholding taxes for Plaintiff and another Diva employee.  (*Id.* ¶

48-49.)  In December 2009, Defendants allegedly admitted that Plaintiff was a Diva employee and informed her that they intended to cure any past tax liabilities, pay "gross up amounts," and pay any future taxes.  (TAC ¶ 54.)  Defendants also allegedly announced to Plaintiff and the other Diva employee that they would create employment contracts for Plaintiff and the other employee and would consider paying rent for Plaintiff's Colorado home office.  (*Id. ¶* 55.)

However, in May 2010, Defendants asked Plaintiff to sign a Consulting Services Agreement.  (*Id.* ¶ 68.)  Defendants offered Plaintiff $27,000 as an incentive to sign this agreement.  (*Id.* ¶ 69.) Plaintiff maintains that the substance of this agreement would have allowed Defendants to enjoy the direction and control of an employer while defeating the employee's entitlement to employer tax contributions by classifying her as an independent contractor.  (*Id.* ¶ 70.)  Plaintiff was allegedly advised by legal counsel that she could be charged with fraud on the IRS if she signed the Consulting Services Agreement.  (*Id.* ¶ 65.)  As such, Plaintiff refused to sign the Consulting Services Agreement.  (*Id.* ¶ 74.)

On July 21, 2010, Defendants terminated their relationship with Plaintiff.  (*Id.* ¶¶ 79-80.) The termination was executed by email and Defendants sent a certified copy of the termination letter to Plaintiff in Colorado.  (*Id.* ¶ 80.)

The same day Plaintiff was terminated, July 21, 2010, Defendants sent "cryptic, damaging" emails indicating that Plaintiff was at fault for the termination to Defendants' broker network and other "industry colleagues."  (*Id.* ¶ 85.)  In addition, at some point after Plaintiff's termination, Defendants "published harmful emails and letters regarding Plaintiff's termination"

to Lune Group OY Ltd. (the "Lune Group"), a competitor of Defendants located in Finland.  (*Id.*)

Finally, Defendant allegedly wrote a letter to the Lune Group threatening the Lune Group with

legal action if they hired Plaintiff.  (*Id.* ¶ 89.)  After learning of these actions, Plaintiff requested

that Defendants retract any negative statements made about her and cease issuing such

statements to parties interested in doing business with Plaintiff.  (*Id.* ¶ 91.)  Defendants allegedly

refused to retract their statements.  (*Id.*)

## PROCEDURAL HISTORY

Plaintiff's Third Amended Complaint, filed on May 3, 2013, asserts two claims for relief

under state law:  (1) tortious interference with economic relations, and (2) wrongful discharge in

violation of public policy.  (*See* TAC.)  It is not contested that the court has jurisdiction over this

matter pursuant to 28 U.S.C. § 1332.  (*See id*. at 1.)

Defendants' Motion to Dismiss was filed on May 15, 2013.[1]  (*See* Mot.)  Defendants

argue in their Motion that the court lacks jurisdiction over Defendants Francine and Carinne

Chambers (hereinafter, collectively, the "Chambers") and that Plaintiff fails to state a claim for

relief.  Plaintiff's Response to Defendants' Motion to Dismiss was filed on June 5, 2013.  (Doc.

No. 65 [Resp.].)  Defendants filed their Reply on June 19, 2013.  (Doc. No. 67 [Reply].)

Accordingly, this matter is ripe for the court's review and recommendation.

---

[1] On June 5, 2013, the court stayed discovery until ruling on Defendants' Motion to Dismiss.
(*See* Order, Doc. No. 66.)

## LEGAL STANDARDS

### A.    *Lack of Personal Jurisdiction*

Federal Rule of Civil Procedure 12(b)(2) provides that a defendant may move to dismiss a complaint for "lack of jurisdiction over the person." Fed. R. Civ. P. 12(b)(2). Plaintiff bears the burden of establishing personal jurisdiction over Defendants. *OMI Holdings, Inc. v. Royal Ins. Co.*, 149 F.3d 1086, 1091 (10th Cir. 1998). In the preliminary stages of litigation, Plaintiff's burden is light. *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995). Where, as here, there has been no evidentiary hearing, and the motion to dismiss for lack of personal jurisdiction is decided on the basis of affidavits and other materials, Plaintiff need only make a *prima facie* showing that jurisdiction exists. *Id.*

Plaintiff "has the duty to support jurisdictional allegations in a complaint by competent proof of the supporting facts if the jurisdictional allegations are challenged by an appropriate pleading." *Pytlik v. Prof'l Res., Ltd.*, 887 F.2d 1371, 1376 (10th Cir. 1989). The allegations in Plaintiff's complaint "'must be taken as true to the extent they are uncontroverted by [Defendants'] affidavits.'" *Wenz*, 55 F.3d at 1505 (*quoting Doe v. Nat'l Med. Servs.*, 974 F.2d 143, 145 (10th Cir. 1992)). If the parties present conflicting affidavits, all factual disputes must be resolved in Plaintiff's favor, and "plaintiff's *prima facie* showing is sufficient notwithstanding the contrary presentation by the moving party." *Id.* (citation omitted). Only well-pleaded facts, as opposed to mere conclusory allegations, must be accepted as true. *Id.*

To determine whether a federal court has personal jurisdiction over a nonresident

5

defendant in a diversity action, the court looks to the law of the forum state.  *Taylor v. Phelan*,

912 F.2d 429, 431 (10th Cir. 1990).  In Colorado, the assertion of personal jurisdiction must

both: (1) satisfy the requirements of the long-arm statute; and (2) comport with due process.  *Id.*;

*Doering v. Copper Mountain*, Inc., 259 F.3d 1202, 1209 (10th Cir. 2001); *Classic Auto Sales,*

*Inc. v. Schocket*, 832 P.2d 233, 235 (Colo. 1992).  Colorado's long-arm statute subjects a

defendant to personal jurisdiction for engaging in — either in person or by an agent — the

"commission of a tortious act within this state," or the "transaction of any business within this

state."  Colo. Rev. Stat. §§ 13–1–124(1)(a)–(b) (2007).  To comport with due process, a

defendant must have minimum contacts with the forum state such that maintenance of the

lawsuit would not offend "traditional notions of fair play and substantial justice."  *Int'l Shoe Co.*

*v. Washington*, 326 U.S. 310, 316 (1945).  Colorado's long-arm statute is a codification of the

"minimum contacts" principle required by due process.  *See Lichina v. Futura, Inc.*, 260 F. Supp.

252, 255 (D. Colo. 1966).  Accordingly, under Colorado law, a court may assert jurisdiction to

the fullest extent permitted by the Due Process Clause of the Fourteenth Amendment.  *See OMI*

*Holdings, Inc.*, 149 F.3d at 1090; *Scheur v. Dist. Ct.*, 684 P.2d 249 (Colo. 1984).

**B.**    ***Failure to State a Claim Upon Which Relief Can Be Granted***

Federal Rule of Civil Procedure 12(b)(6) provides that a defendant may move to dismiss

a claim for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6)

(2007).  "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that

the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally

sufficient to state a claim for which relief may be granted."  *Dubbs v. Head Start, Inc.*, 336 F.3d

6

1194, 1201 (10th Cir. 2003) (citations and quotation marks omitted).

"A court reviewing the sufficiency of a complaint presumes all of plaintiff's factual allegations are true and construes them in the light most favorable to the plaintiff." *Hall v. Bellmon*, 935 F.2d 1106, 1198 (10th Cir. 1991). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pleaded facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The *Iqbal* evaluation requires two prongs of analysis. First, the court identifies "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusion, bare assertions, or merely conclusory. *Id*. at 1949–51. Second, the Court considers the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id*. at 1951. If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id*. at 1950.

Notwithstanding, the court need not accept conclusory allegations without supporting factual averments. *Southern Disposal, Inc., v. Texas Waste*, 161 F.3d 1259, 1262 (10th Cir. 1998). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1940. Moreover, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the

7

elements of a cause of action will not do.' Nor does the complaint suffice if it tenders 'naked

assertion[s]' devoid of 'further factual enhancement.'" *Id.* at 1949 (citation omitted). "Where a

complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of

the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*,129 S. Ct. at 1949

(citation omitted).

## ANALYSIS

### A.     *Personal Jurisdiction over the Chambers*

The court must conduct a two-step analysis to determine whether the exercise of personal

jurisdiction comports with due process. *Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc.,* 618 F.3d

1153, 1159 (10th Cir. 2010). First, the court considers "whether the defendant has such

minimum contacts with the forum state that [s]he should reasonably anticipate being haled into

court there." *Id.* at 1159-60 (citations and internal quotation marks omitted). "This minimum

contacts standard may be satisfied by showing general or specific jurisdiction. " *Id.* at 1160.

"Second, if the defendant has the minimum contacts with the forum state, [the court]

determine[s] whether the exercise of personal jurisdiction over the defendant offends traditional

notions of fair play and substantial justice." *Id.* (internal quotation marks omitted).

Plaintiff does not appear to argue that the Chambers are subject to "general" personal

jurisdiction;[2] accordingly, the court proceeds to the issue of specific jurisdiction. *Id.* Specific

jurisdiction is predicated upon a defendant's minimum contacts with the forum that give rise to

---

[2] "[A] court may maintain general jurisdiction over a nonresident defendant, based on the
defendant's continuous and systematic general business contact with the forum state." *Trujillo v.
Williams,* 465 F.3d 1210, 1218 n.7 (10th Cir. 2006) (internal quotation marks omitted).

the cause of action.  *Kuenzle v. HTM Sport-Und Freizeitgerate AG*, 102 F.3d 453, 455 (10th Cir.

1996).  The court must consider whether the Chambers have "'purposefully directed' [their]

activities at residents of the forum . . . and [whether this] litigation results from alleged injuries

that 'arise out of or relate to' those activities."  *Burger King v. Rudzewicz*, 471 U.S. 462, 472

(1985).

> **1.**    ***Fiduciary Shield Doctrine***

Defendants argue that the Chambers lack sufficient minimum contacts to support the

exercise of specific jurisdiction.  More specifically, Defendants cite to *Ten Mile Industrial Park*

*v. Western Plain Service Corp.,* 810 F.2d 1518, 1527 (10th Cir. 1987), and contend that the

Chambers' contacts with Colorado all arose out of their capacities as representatives of Diva,

rather than in their individual capacities, and that therefore the "fiduciary shield doctrine"

protects them from being haled into court in Colorado.

A recent Tenth Circuit opinion, *Newsome v. Gallacher,* 722 F.3d 1257, 1275 (10th Cir.

2013)[3], acknowledged that, "[o]n two fronts, [Tenth Circuit] case law displays significant

confusion over [the fiduciary shield] doctrine."  First, the Tenth Circuit has "sometimes failed to

distinguish between the fiduciary shield doctrine and a related concept that cautions against

imputing contacts to a business's operator"—the "no-imputed contacts" rule.  *Id.*  On the one

hand, the no-imputed contacts rule provides:

> Jurisdiction over a corporation in a particular forum does not automatically confer
> jurisdiction over that corporation's employees.  If, for example, a Kansas
> company markets a defective product in Oklahoma and the product ends up

---

[3] The *Newsome* opinion was issued after briefing on Defendants' Motion to Dismiss was
completed.  As such, the parties have not addressed *Newsome* in their briefs.

> injuring an Oklahoma resident, that is usually enough to confer personal jurisdiction over the company in Oklahoma courts in the ensuing product liability suit.  But under the no-imputed-contacts rule, Oklahoma's jurisdiction over the company does not necessarily give Oklahoma jurisdiction over the company's Kansas employees.  Employees' contacts with the forum state are not to be judged according to their employer's activities there.

*Id.* (citation, internal quotations, and alterations omitted).  *See also Ten Mile,* 810 F.2d at 1527 ("[The corporate defendants' contacts cannot be attributed to the [corporate officers] . . . . Jurisdiction over the representatives of a corporation may not be predicated on jurisdiction over the corporation itself.").

"The fiduciary shield doctrine, by contrast, gives even greater protection to employees of companies."  *Newsome,* 722 F.3d at 1275.

> It maintains that even if a particular Kansas employee has substantial contacts with Oklahoma—e.g., the employee repeatedly traveled to Oklahoma to promote the product—those contacts will not count against the employee in the personal jurisdiction analysis so long as the employee acted solely on the corporation's behalf.

*Id.  See also Ten Mile,* 810 F.2d at 1527 ("Where the corporate acts of individual principals of a corporation in the jurisdiction were carried out solely in the individuals' corporate or representative capacity, the corporate structure will ordinarily insulate the individuals from the court's jurisdiction . . . .")

The second source of confusion, is that, at times, the Tenth Circuit has "failed to clarify whether the fiduciary shield doctrine is dictated by federal due process (*i.e.,*  whether it is integral to the minimum contacts test) or whether it only exists, if at all, as a matter of state law." *Newsome,* 722 F.3d at 1275.  The *Newsome* decision resolves this confusion—while the "no-imputed contacts rule is integral to the minimum contacts due process test" (*i.e.* federal law), the

"fiduciary shield doctrine [] only exists as a matter of state law." *Id.*

The impact of the fiduciary shield doctrine is on full display in this case. Here, it appears likely that a significant amount of the Chambers' purported contacts with Colorado were taken in a corporate or representative capacity. More specifically, it appears that the Chambers acted in their capacities as corporate representatives of Diva when they (1) engaged Plaintiff to work for Diva, (2) increased her work responsibilities, (3) engaged in an employment relationship with Plaintiff over several years, (4) attempted to resolve the dispute over Diva's tax liability in the United States, (5) requested that Plaintiff sign the Consulting Services Agreement and offered her a $27,000 incentive to do so, (6) and terminating her after she refused to sign that agreement were all taken in their capacities as corporate representatives of Diva.[4]

However, under *Newsome,* the threshold question is whether Colorado recognizes the fiduciary shield doctrine. The court is unable to locate any Colorado case law discussing the fiduciary shield doctrine. As such, not only is the court unable to discern whether Colorado recognizes the fiduciary shield doctrine, it also cannot be certain how Colorado would apply the doctrine to the facts of this case. *Compare McGreal v. Semke,* 836 F. Supp. 2d 735, 739 (N.D. Ill. 2011) (fiduciary shield doctrine does not apply if the "agent was acting also or instead on his own behalf—to serve his personal interest.") *with MMK Group, LLC v. SheShells Co., LLC,* 591 F. Supp. 2d 944, 954 (N.D. Ohio 2008) (fiduciary shield doctrine does not apply where corporate

---

[4] It is doubtful, however, that the Chambers' actions of (1) publishing harmful emails and letters regarding Plaintiff's termination to the Lune Group and other parties and then (2) threatening the Lune Group with legal action if they "hired" Plaintiff were taken in their corporate capacities. These actions were more likely taken in their capacities as individuals.

officers "were personal, active participants in allegedly tortious or violative conduct."); *Intermed Labs., Inc. v. Perbadanan Geta Felda,* 898 F. Supp. 417, 420 (E.D. Tex. 1995) (fiduciary shield doctrine does not protect corporate officer from personal jurisdiction based on alleged tortious interference with contract committed in corporate capacity).

Under these circumstances, the court elects to follow the approach taken in *Cantrell v. Extradition Corporation of America,* 789 F. Supp. 306, 310 (W.D. Mo. 1992). There, as here, the court found that Missouri courts had not addressed whether the Missouri long-arm statute incorporates the fiduciary shield doctrine to bar "personal jurisdiction over a nonresident defendant whose only contacts with Missouri are in an employment capacity." *Id.* "In the absence of direct guidance from Missouri on this issue," the court relied "on Missouri courts' interpretation of its long-arm statute as permitting jurisdiction essentially as broad is authorized by the United States Constitution." *Id.* Thus, the *Cantrell* court rejected the corporate-employee defendant's argument that jurisdiction could not be asserted over him because he acted as a corporate representative, and instead considered all of the defendants contacts with the forum state. *Id.*

Here, as in *Cantrell,* Colorado courts have recognized that Colorado's long-arm statute authorizes the exercise of personal jurisdiction to the fullest extent permitted by the United States Constitution. *Scheuer v. Dist. Ct.,* 684 P.2d 249, 250 (Colo. 1984). Because the fiduciary shield doctrine does not limit the exercise of personal jurisdiction under the Due Process clause, *Newsome, see* 722 F.3d at 1275, in determining whether it has jurisdiction over the Chambers,

the court will consider *all* of their contacts with Colorado—regardless of whether those contacts

occurred in a corporate or individual capacity.

### 2.	Minimum Contacts

Having rejected the application of the fiduciary shield doctrine, the court turns to whether

the Chambers have minimum contacts with Colorado to support the exercise of jurisdiction over

them.  As discussed above, to determine whether a nonresident defendant's contacts with the

forum state are sufficient to establish personal jurisdiction over the defendant, courts consider

whether (1) the defendant purposefully directed its activities at residents of the forum state and

(2) the plaintiff's injury arose from those purposefully directed activities.  *Burger King v.*

*Rudzewicz,* 471 U.S. at 472; *see also Dudnikov v Chalk & Vermillion Fine Arts, Inc.,* 514 F.3d

1063, 1070

### a.	Purposeful Direction

In tort lawsuits, to determine whether minimum contacts exist, the court first asks

whether the defendants "purposefully directed" its activities at the forum state.  *Dudnikov,* 514

F.3d at 1071.  This "purposeful direction" test has three elements: "(a) an intentional action . . .

that was (b) expressly aimed at the forum state . . . with (c) knowledge that the brunt of the injury

would be felt in the forum state."  *Id.* at 1072 (citing *Calder v. Jones,* 465 U.S. 783 (1984)).

At the outset, the court addresses Defendants' contention that "only four allegations in

the Complaint specifically name Francine and Carinne Chambers" and that those allegations are

not sufficient to establish the minimum contacts between the Chambers and Colorado.  (Mot. at 3

(citing TAC ¶¶ 4,7, 100, 101.)  While there are indeed only four allegations that specifically

13

name the Chambers, Plaintiff's Third Amended Complaint specifies that Diva, Francine Chambers, and Carinne Chambers are collectively referred to therein as "Defendants." (TAC at 1.) The Third Amended Complaint includes a litany of allegations regarding "Defendants'" conduct—including allegations that "Defendants" engaged in the allegedly tortious conduct that is the subject of this lawsuit. (*See, e.g., id.* ¶¶ 68-70, 79-80, 86-87, 89.) Moreover, the Third Amended Complaint also alleges that the Chambers "committed tortious conduct .. . . [that is] the subject of this lawsuit." (TAC ¶¶ 7.)

To be sure, Plaintiff's practice of referring to Defendants' alleged conduct collectively, rather than delineating the particular Defendant(s) responsible for each alleged action, is inexact and inartful. However, in resolving a dispute over personal jurisdiction, the court must accept the allegations in the complaint as true to the extent that they are uncontroverted by the defendants' affidavits. *Wenz*, 55 F.3d at 1505. Defendants have not submitted any affidavit(s) or other evidence disputing Plaintiff's allegations that they were all involved in the actions giving rise to Plaintiff's claims. Accordingly, in determining whether the Chambers have minimum contacts, the court considers all of the Third Amended Complaint against the Chambers, including those that mention Defendants collectively.

Turning to the purposeful direction test, to satisfy the first prong, Plaintiff need only allege that the Chambers took some intentional act. Here, Plaintiff alleges that Defendants terminated her when she refused to sign the Consulting Services Agreement. (TAC ¶ 79.) Plainly, terminating an employee is an intentional act. In addition, Plaintiff alleges that Defendants "intentionally . . . published harmful emails and letters regarding Plaintiff's

14

termination" to Lune Group, and threatened Lune Group with litigation if they hired Plaintiff. (*Id.* ¶¶ 86, 89.)  Based on these allegations, the court finds that Plaintiff has satisfied the intentional act prong. [5] *Dudnikov,* 514 F.3d at 1073-74.

The next prong, "express aiming," focuses on defendants' intentions and seeks to determine the "focal point" of defendants' actions.  *Dudnikov,* 514 F.3d at 1074-75.  The plaintiff's residence in the forum, and suffering harm there, standing alone, are insufficient. *Schrader v. Biddinger,* 633 F.3d 1235,1244 (10th Cir. 2011)  The Tenth Circuit has adopted a more restrictive approach to the express aiming test, holding that the forum state itself must be the focal point of the defendant's intentional action.  *Id.* at 1075 n.9.

As to Plaintiff's allegations of wrongful discharge, the court finds meaningful guidance from *Morrison v. MacDermid, Inc.,* No. 07-cv-01535, 2008 WL 4293655 (D. Colo. Sept. 16, 2008).  In *Morrison,* the plaintiff was employed in Colorado as a Corporate Controller for MacDermid, a Connecticut corporation headquartered in Colorado.  The plaintiff reported, both internally and externally, improper accounting procedures and potential violations of SEC insider trading rules.  *Id.* at *1-2.  The plaintiff was ultimately summoned to Connecticut for a meeting with the chairman of the company's audit committee, who informed plaintiff that his allegations of insider trading and accounting improprieties were false and that, consequently, he could no

---

[5] The court notes that the Tenth Circuit has yet to decide "whether under *Calder* plaintiffs must also allege the [intentional] act was wrongful or tortious in some sense. " *Dudnikov,* 514 F.3d 1063 *accord Grynberg v. Ivanhoe Energy,* 490 F. App'x 86, 97 (10th Cir. 2012).  However, the court need not resolve this question as the court finds *supra* that Plaintiff has sufficiently alleged that Defendants engaged in wrongful or tortious conduct.

longer serve as the company's Corporate Controller. *Id.* at *2. After refusing to accept a severance package or settlement, the plaintiff was terminated. *Id.*

The plaintiff brought, *inter alia,* a claim for wrongful termination in violation of public policy against the company and the chairman. The chairman moved to dismiss for lack of personal jurisdiction.

District Judge Wiley Y. Daniel found that jurisdiction existed over the chairman because his alleged wrongdoing was expressly aimed at Colorado. *Id.* at *6. First, the chairman worked for a company headquartered in Colorado and traveled to the state quarterly to attend meetings. *Id.* at *5. Further, his connection to the plaintiff was a direct result of those ties to Colorado. *Id.* at *6. Specific jurisdiction exists when a party derives some benefit from purposive conduct directed at the forum state. *Id.* (citing *Dudnikov,* 541 F.3d at 1078). As such, "in exchange for the benefit of doing business in Colorado, the [chairman was] deemed to have consented to jurisdiction for claims relating to that conduct." *Id.* (citing *Dudnikov,* 541 F.3d at 1078).

Second, although the chairman fired the plaintiff in Connecticut, it was a direct result of the chairman's ties with Colorado. *Id.* Indeed, all of the effects and injuries arising out of the plaintiff's termination occurred in Colorado. *See id.* Ultimately, Judge Daniel concluded that "[a]n individual injured in Colorado should not have to travel to Connecticut to seek redress from a person, who, though remaining in Connecticut, knowingly caused injury to Plaintiff in Colorado." *Id.* (citing *Calder,* 465 U.S. at 790).

Unlike in *Morrison,* Diva was not headquartered in Colorado. However, Diva and the Chambers engaged Plaintiff to work almost exclusively for Diva based out of her home office in

Colorado.  (TAC ¶ 3.)  From this "Colorado office," Plaintiff conducted extensive Diva business, including, but not limited to, managing incoming orders, phone calls, correspondence, and emails.  (*See, e.g., id.* ¶ 17q-s, v.)  And, although it does not appear that the Chambers had physical contacts with Colorado, they regularly held phone meetings with Plaintiff and other staff in Colorado, conferred daily with Plaintiff in regards to ongoing projects, and issued salary and commission checks to Plaintiff in Colorado. (17y, 19.)  *See also Burger King,* 471 U.S. ("We have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.")  As in *Morrison,* "[i]n exchange for the benefit of doing business in Colorado, [the Chambers] are deemed to have consented to jurisdiction for claims relating to that conduct."  2008 WL 4293655 at *6.

Further, the Chambers' decision to terminate Plaintiff was a direct result of these contacts with Colorado.  The effect and injury of that decision was felt in Colorado, where Plaintiff was employed by Diva and conducted business on Diva's behalf.  Indeed, the Chambers sent a certified copy of the termination letter to Plaintiff in Colorado.  (TAC ¶ 80.)  Ultimately, it is clear that the focal point of the Chambers' decision to terminate was Colorado.  Indeed, if not Colorado, it is unclear what other forum might be the focal point of this action.

Turning to the Chambers' allegedly harmful and threatening emails and correspondence—"defamatory postings may give rise to personal jurisdiction if they are directed specifically at a forum audience or otherwise make the forum state the focal point of the message."  *Shrader,* 633 F.3d at 1244.  Here, the letters and emails were not published to a Colorado audience.  Instead, Plaintiff admits that the Lune Group is located in Finland and

17

Plaintiff has otherwise failed to name any other third party that received the Chambers'
correspondence.  Nevertheless, the court finds that Colorado was the focal point of those
messages.  More specifically, the Chambers' published to the Lune Group harmful emails and
letters regarding Plaintiff's termination, which, as discussed above, effectively occurred in
Colorado.  In addition, Colorado was the focal point of the Chambers' letter threatening to sue
the Lune Group based on the Lune Group's prospective contract with Plaintiff, a known
Colorado resident.

The final prong of the purposeful direction test is the knowledge that the brunt of the
activity would be felt in Colorado.  *Dudnikov,* 514 F.3d at 1077.  This element "concentrates on
the consequences of the defendant[s'] actions—where was the alleged harm actually felt by the
plaintiff."  *Id.* at 1075.  Here, the harm from Plaintiff's termination from employment with Diva,
as well as the disparaging and threatening correspondence sent to the Lune Group, was felt solely
by Plaintiff in Colorado.

### b.      *Arising Out of*

In addition to the purposeful direction test, specific jurisdiction requires that the
plaintiffs' injuries arise out of defendants' forum related activities.  *Dudnikov,* 514 F.3d at 1071.
The Tenth Circuit has recognized that this inquiry may be guided by either a but-for test or a
proximate cause test.  *Id.* at 1078.  Under the but-for approach, "any event in the causal chain
leading to the plaintiff's injury is sufficiently related to the claim to support the exercise of
personal jurisdiction."  *Id.*  The proximate cause test, by contrast, "is considerably more

restrictive and calls for courts to 'examine whether any of the defendant's contacts with the forum are relevant to the merits of the plaintiff's claims" *Id.*

Plaintiff's allegations are sufficient to satisfy the "arising out of" element even under the more restrictive proximate cause test. The Chambers' hiring of Plaintiff to work almost exclusively for Diva from her Colorado office, increasing her work responsibilities, and their contacts with Plaintiff throughout her tenure with the company are directly related to a primary questions underlying Plaintiff's wrongful discharge claim—that is, whether Plaintiff was an employee of Diva or, alternatively, an independent contractor. And, of course, the Chambers' decision to terminate Plaintiff constitutes the consummating act underlying that claim.

Further, Plaintiff's tortious interference claim relates to the emails and letters the Chambers sent regarding Plaintiff's termination, which effectively occurred in Colorado. Accordingly, the court finds that Plaintiff's claims and injuries arise out of the Chambers' contacts with Colorado.

Altogether, for the foregoing reasons, the court finds that (1) the Chambers purposefully directed their activities at Plaintiff, a resident of the forum state, and (2) Plaintiff's injury arose from those purposefully directed activities. Therefore, the court finds that the Chambers have sufficient minimum contacts to support the exercise of specific personal jurisdiction over the Chambers.

### 3.     *Fair Play and Substantial Justice*

"When a plaintiff satisfies [her] minimum contacts burden, the burden shifts to the defendant to demonstrate that exercising personal jurisdiction would nonetheless 'offend

19

traditional notions of fair play and substantial justice.'" *Newsome,* 722 F.3d at 1257 (citing *Dudnikov,* 514 F.3d at 1080). "Such cases are rare." *Rusakiewicz,* 556 F.3d at 1102. The defendant "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King,* 471 U.S. at 477.

Here, in addressing this question, Defendants simply fall back on their argument that the Chambers lack minimum contacts with Colorado. (Reply at 3; *see also* Mot. at 4.) This argument is unavailing for the reasons discussed above. Defendants also argue that, when a defendant is from another country, "great care and reserve should be exercised" before exerting personal jurisdiction. (Mot. at 5 (quoting *Grynberg v. Ivanhoe Energy, Inc.,* 666 F. Supp. 2d 1218, 1233 (D. Colo. 2009).) The mere fact that the Chambers are from Canada is not sufficiently compelling to support a finding that exercising jurisdiction would be unreasonable.

Altogether, the court finds that it has specific jurisdiction over the Chambers. Indeed, as in *Morrison,* Plaintiff, "[a]n individual injured in Colorado[,] should not have to travel to [Canada] to seek redress from [] person[s], who, though remaining in [Canada], knowingly caused injury to Plaintiff in Colorado." 2008 WL 4293655 at *6. Therefore, Defendants' Motion to Dismiss is properly denied to the extent that it seeks to dismiss the Chambers for lack of personal jurisdiction.

**B.      *Failure to State a Claim***

Defendants also argue, pursuant to Rule 12(b)(6), that Plaintiff's Third Amended Complaint fails to state a claim upon which relief can be granted. The court addresses each claim in turn below.

20

### 1.     *Tortious Interference*

To establish a claim for tortious interference with prospective business relations under Colorado law, a plaintiff must show intentional and improper interference with another's prospective contractual relation. *Dolton v. Capitol Fed. Sav. & Loan Ass'n,* 642 P.2d 21, 23 (Colo. App. 1981). Intentional and improper interference preventing the formation of a contract is sufficient. *Id.*

Based on Plaintiffs allegations, it is reasonable to infer Defendants knew that, after they terminated Plaintiff's employment with Diva, Plaintiff was seeking employment with prospective employers, including the Lune Group. (*See, e.g.,* TAC ¶¶ 89, 91.) Defendants improperly and intentionally interfered with Plaintiff's prospective employment by "publish[ing] harmful emails and letters regarding Plaintiff's termination" to the Lune Group and "threaten[ing] the Lune Group with legal action if they 'hired' Plaintiff." (*Id.* ¶¶ 86-89.) Defendants' actions, as well as their failure to retract these statements, caused Plaintiff to lose "her prospective contract with Lune Group, at a minimum." (*Id.* ¶ 98.) These allegations are sufficient to state a claim for intentional interference with prospective business advantage. *Compare with Perkins v. Federal Fruit & Produce Co.,* 861 F. Supp. 2d 1285, 1291-1292 (D. Colo. 2012).

Defendants argue that Plaintiff has not alleged that Defendants' interference was "improper" because it was not accompanied by "wrongful means," which is limited to "physical violence, fraud, civil suits and criminal prosecution." (Mot. at 8 (quoting *Amoco Oil Co. v. Ervin,* 908 P.2d 493, 502 (Colo. 1995)). However, whether a defendant employed "wrongful

means" is not an element of a claim for tortious interference with prospective business relations—it is an element of the competitor's privilege defense to such a claim. *See Zimmer Spine, Inc.,* No. 10-cv-03112-LTB-CBS, 2011 WL 4089535, at *5 (D. Colo. Sept. 14, 2011) ("Under Colorado law, the competitor's privilege is not an element of plaintiff's claim, but an affirmative defense that must be asserted and proven by the defendant."). To establish this defense, a defendant must show that

> (a) the relation concerns a matter involved in the competition between the actor and the other and
>
> (b) the actor does not employ wrongful means and
>
> (c) his action does not create or continue an unlawful restraint of trade and
>
> (d) his purpose is at least in part to advance his interest in competing with the other.

*Occusafe,* 54 F. 3d at 623 (citing Restatement (Second) of Torts § 768); *Dolton,* 624 P.2d at 23 (adopting § 768 of the Restatement as a "clear statement of the law").

Here, Defendants have addressed only the wrongful means element of the competitor's privilege defense. They have not addressed the remaining elements. Nor is it clear from the face of the complaint that the defense applies. *Zimmer Spine,* 2011 WL 4089535, at *5 (citing *Bullington v. United Airlines, Inc.,* 186 F.3d 1301, 1310 n.3 (10th Cir. 1999) *overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101 (2002)) (dismissing a claim under Fed. R. Civ. P. 12(b)(6) is only proper where that defense is clear from the face of the complaint); *see also Occusafe, Inc. v. EG&G Rocky Flats, Inc.,* 54 F.3d 618, 623 (10th Cir. 1995) ("As a general rule . . . a plaintiff

cannot sue *one of its competitors* for intentional interference in prospective economic advantage" due to the competitor's privilege) (emphasis added).

Defendants also argue that although Plaintiff alleges she had a prospective contract with the Lune Group, "prospective employment does not qualify as a 'prospective contractual relation.'" (Mot. at 8) (citing *Mem'l Gardens, Inc. v. Olympian Sales & Mgmt. Consultants, Inc.,* 690 P.2d 207, 211 (Colo. 1984)). While Defendants are correct that "[t]he Restatement provides less protection for contracts terminable at will because an interference with a contract terminable at will is an interference with a future expectancy, not a legal right," *Mem'l Gardens, Inc.,* 690 P.2d at 211, this does not mean that there are *no* protections from interference with prospective employment opportunities, *see Meehan v. Amax Oil & Gas, Inc.,* 796 F. Supp. 461, 467 (D. Colo. 1992 (holding that the tort of intentional interference with contractual relations protects the prospect of obtaining employment); *Perkins,* 861 F. Supp. 2d at 1291-92 (finding that the plaintiffs stated a claim for interference with prospective employment).

Accordingly, notwithstanding Defendants' protestations to the contrary, the court finds that Plaintiff has stated a plausible claim for tortious interference with prospective economic relations. Therefore, Defendants' Motion to Dismiss is properly denied with respect to Plaintiff's first claim for relief.

### 2. *Wrongful Discharge in Violation of Public Policy*

Absent an express contract providing otherwise, Colorado law presumes that an employment relationship is terminable at will by either party. *Cont'l Air Lines, Inc. v.*

23

*Keenan,* 731 P.2d 708 (Colo. 1987).  A common law exception to this presumption is that

an employer may not terminate an employee in violation of public policy.  *Crawford*

*Rehab Servs., Inc. v. Weissman,* 938 P.2d 540 (Colo. 1997).[6]

In order to state a claim for wrongful termination in violation of public policy, a plaintiff

must show the following:

> [1] the employer directed the employee to perform an illegal act or prohibited the
> employee from performing a public duty or exercising an important job-related
> right or privilege;
>
> [2] the action directed by the employer would violate a specific statute relating to
> the public health, safety, or welfare, or would undermine a clearly expressed
> public policy relating to the employee's basic responsibility as a citizen or the
> employee's rights or privileges as a worker;
>
> [3] the employee was terminated as a result of refusing to perform the act directed
> by the employer; and
>
> [4] the employer was aware, or reasonably should have been aware, that the
> employee's refusal to comply with the order was based on the employee's
> reasonable belief that the action ordered by the employer was illegal, contrary to
> clearly expressed statutory policy relating to the employee's duty as a citizen, or
> violative of the employee's legal rights or privileges as a worker.

*Jaynes v. Centura Health Corp.*, 148 P.3d 241, 243 (Colo. App. 2006) (citing *Martin Marietta*

*Corp. v. Lorenz*, 823 P.2d 100 (Colo.1992)).

The court finds that Plaintiff fails to state a claim for wrongful discharge in violation of

public policy.  At the outset, it is unclear that Defendants "directed" Plaintiff to perform any act.

---

[6] The court notes that the Chambers may not be proper defendants to this claim.  *Ayon v. Kent
Denver School,* No. 12-cv-2546-WJM-CBS, 2013 WL 1786978, at *7 (D. Colo. Apr. 26, 2013)
(finding that, based on review of case law from Colorado and other states, a corporate officer or
employee cannot be personal liable for a claim of wrongful discharge).  However, the parties
have not raised this issue, and the court declines to do so *sua sponte.*

Instead, they merely requested that Plaintiff sign the Consulting Services Agreement memorializing her status as an independent contractor and terminated their relationship with her when she refused to do so.

Nevertheless, even assuming that Defendants did "direct" Plaintiff to sign the Consulting Services Agreement, it is unclear how this amounted to an illegal act.  First, Plaintiff's allegations fail to establish that signing the Consulting Services Agreement would violate a specific statute relating to the public health, safety, or welfare.  Although Plaintiff alleges that Defendants violated the Colorado Wage Act, Colo. Rev. Stat. § 8-4-101, *et seq.,* and the Internal Revenue Code, 28 U.S.C. § 3111, by failing to pay FICA and other employment taxes (TAC ¶ 111), it is unclear how these statutes relate to public health, safety, or welfare.  Moreover, even assuming Defendants violated these statutes, those violations occurred in the past, before Plaintiff was asked to sign the Consulting Services Agreement governing her future status.

In addition, these statutes would not have been violated simply because Plaintiff signed the Consulting Services Agreement.  Rather, it would have taken additional volitional acts <u>by Defendants</u>—namely a continued failure to pay U.S. taxes otherwise required of them—before a violation of these statutes could have arguably occurred.

Second, Plaintiff's allegations also fail to establish that signing the Consulting Services Agreement would undermine a clearly expressed public policy relating to Plaintiff's basic responsibility as a citizen or her rights or privileges as a worker.  Plaintiff maintains that she did not want to perpetrate a fraud on the Internal Revenue Service by signing an agreement that indicated she was an independent contractor when she was, in fact, an employee.  However,

while Plaintiff may have believed that the Consulting Services Agreement mischaracterized her as an independent contractor, Plaintiff has not directed the court to any authority establishing a clearly expressed policy against an employee signing an agreement that misclassifies as an her as an independent contractor.  Indeed, for federal employment tax purposes, whether an individual is an employee, or, alternatively, an independent contractor, is governed by common law rules. *See, e.g., Marvel v. United States,* 719 F.2d 1507, 1514 (10th Cir. 1983) (1983) (citing 26 U.S.C. § 3121(d), 3306(i), 3401(c)).[7]  As such, it is unlikely that a contract, on its own, would dictate whether a person is an employee or independent contractor for tax purposes.

Finally, Plaintiff's allegations fail to suggest that Defendants were aware, or reasonably should have been aware, that Plaintiff's refusal to sign the Consulting Services Agreement was due to her belief that doing so was legally impermissible.  Plaintiff alleges only that she "refused to enter into the agreement" (TAC ¶ 74)—she does not allege that she informed Defendants of the basis for that decision.  Although Plaintiff maintains that it "is obvious that employers cannot avoid the payment of employment taxes by mischaracterizing their employees as independent contractors" (Resp. at 11), it is not obvious that Defendants would have understood Plaintiff's position that merely entering into an agreement classifying her as an independent contractor would constitute tax evasion.

---

[7]  For tax purposes, an employment relationship exists "when the person for whom the services are performed has the right to direct and control the method and manner in which the work shall be done and the result to be accomplished" whereas an independent contractor "engages to perform services for another according to [her] own method and manner, free from direction and control of the employer in all matters relating to the performance of the work, except as to the result or the product of his work."  *Marvel,* 719 F.2d at 1514.

Accordingly, for the foregoing reasons, the court finds that Plaintiff fails to state a claim for wrongful discharge in violation of public policy.  Therefore, the court finds that Defendants' Motion to Dismiss is properly granted as to Plaintiff's second claim for relief.

WHEREFORE, for the foregoing reasons, I respectfully

RECOMMEND that Defendants' "Motion to Dismiss Third Amended Complaint Pursuant to Rule 12(b)(2) and (6)" (Doc. No. 58) be GRANTED with respect to Plaintiff's second claim for wrongful discharge in violation of public policy and DENIED to the extent that it (1) seeks to dismiss Defendants Francine and Carinne Chambers for lack of personal jurisdiction and (2) seeks to dismiss Plaintiff's first claim for tortious interference with prospective economic relations.

## ADVISEMENT TO THE PARTIES

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995).  A general objection that does not put the district court on notice of the basis for the objection will not preserve the objection for *de novo* review.  "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Prop. Known As 2121 East 30th Street, Tulsa, Okla.*, 73 F.3d 1057, 1060 (10th Cir. 1996).  Failure to

make timely objections may bar *de novo* review by the district judge of the magistrate judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge.  *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (a district court's decision to review a magistrate judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule");  *One Parcel of Real Prop.*, 73 F.3d at 1059-60 (a party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review);  *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Ref. Sys., Inc*., 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the magistrate judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the magistrate judge's ruling); *but see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

Dated this 26th day of February, 2014.

BY THE COURT:

_____
Kathleen M. Tafoya
United States Magistrate Judge